/ʜᴛʌ/

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CENTRAL STATES, SOUTHEAST AND ) 
SOUTHWEST AREAS PENSION FUND, ) 
AND HOWARD MCDOUGALL, TRUSTEE ) 
 ) 
Plaintiffs ) 
 ) No. 06 C 6865
v. ) 
 ) The Honorable William J. Hibbler
GOPHER NEWS COMPANY ) 
 ) 
Defendant. ) 

## MEMORANDUM OPINION AND ORDER

Central States, Southeast and Southwest Areas Pension Fund (the Plan) believed that Gopher News Company (Gopher News or the Company) violated the adverse selection rule of the Company's participation agreement with it. The Plan conducted an audit, and determined that the Company owed in excess of $275,000 in unpaid contributions, which the Plan seeks to recover in this dispute.

Gopher News seeks to implead Local Number 638 of the Miscellaneous Drivers, Helpers & Warehousemen's Union (Local 638 or the Union), alleging that Local 638 should indemnify it against the Plan's claims. At the same time, four union members seek to intervene to bring complaints against the Plan, the Union, and the Company, alleging that their decisions adversely affected the members' pensions. Finally, added to the mess, the Company also seeks to amend its answer, based on its belief that the Plan and the Union were in cahoots to mislead the Company about the validity of the collective bargaining agreement.

1

## I. Factual and Procedural Background

Gopher News distributes magazines and other periodicals to retail establishments in the Upper Midwest. Its employees are divided into two distinct bargaining units, the "Warehouse" unit and the "Drivers" unit. Local 638, however, represents both units. Until 1992, both bargaining units negotiated pension provisions that called for Gopher News to make pension contributions to the Plan. But in 1992, the Union and Gopher News agreed to withdraw the Warehouse unit employees from the Plan and instead require contributions to a Company-sponsored 401(k) plan. Gopher News incurred and paid withdrawal liability to the Plan at that time. The Drivers unit remained part of the Plan.

By 1998, Gopher News once again sought to convince the Drivers unit to consider withdrawing from the Plan in favor of a company-sponsored 401(k) plan. The Drivers unit remained steadfast in their desire to remain with the Plan, but proposed to modify the Warehouse unit's collective bargaining agreement to alleviate the Company's concerns about the financial viability of the Plan. The Union proposed modifying the CBA to add two new job classifications to the Warehouse unit: "Warehouse/Driver" and "Relief Driver." Because the Warehouse unit no longer participated in the Plan, the Union and the Company did not submit this CBA to the Plan. In short, the new job classification allowed Gopher news to assign to the Warehouse unit any new hires, even if those new hires were drivers. At the same time, the already-employed drivers would continue to reap the benefits of the Central States Pension Plan. This job classification, according to the Plan, violates the adverse selection rule.

In its Third-Party Complaint Gopher News alleges that the Union represented during the 1998 negotiations that it had communicated the proposal to Central States and that Central States had been

2

amenable to the CBA modifications. The Company and the Union renegotiated the CBAs in 2001, including the same creative job classifications, and prepared to do the same in 2005, when only four drivers remained in the drivers unit (the four drivers who currently seek to intervene).

According to Gopher News, just prior to the execution of the 2005 CBAs, the Plan got wind of the Union's and Company's arrangement and planned to conduct an audit. In its Motion to Amend, Gopher News alleges that the Union conspired with the Plan to delay the audit until *after* the Company and Union signed the 2005 CBA, fearing that if the Company learned of the audit that it would no longer agree to the job classification arrangement and would instead push to withdraw from the Plan. Two days after the Union forwarded the 2005 CBA to the Plan, the Plan announced the audit, which lead to this suit.

At the outset of the case, filed in December 2006, the parties agreed to schedule and conduct an audit to determine whether the parties could easily settle the case. The Plan completed a preliminary audit by April 2007, and the parties engaged in settlement discussions through the summer, but failed to reach resolution. The Plan refined its preliminary findings in September 2007. A few months later the parties began the flurry of motions presently at issue before the Court.

## II. Motion to File Third-Party Complaint

Rule 14(a) of the Federal Rules of Civil Procedure allows a defendant to implead a third-party "who is or may be liable to the third-party plaintiff for all or part of the plaintiff's claim against the third-party plaintiff." Fed R. Civ. P. 14(a). The purpose behind impleader is to promote judicial efficiency by eliminating the necessity for a defendant to bring a separate action against a third-party who may be secondarily liable to the defendant for all or part of the original claim. The decision to allow a third-party complaint is left to the discretion of the trial court based on the timeliness of the

3

motions and whether the third-party complaint will introduce unrelated issues to the litigation or unduly complicate the original suit. *Highlands Ins. Co. v. Lewis Rail Serv. Co.*, 10 F.3d 1247, 1251 (7th Cir. 1993).

The Plan argues that Section 515 of ERISA implicitly limits the types of claims that can be impleaded in ERISA actions. Congress added Section 515 of ERISA in 1980 to deal with problems in collection actions, providing that promises are enforceable "to the extent not inconsistent with law." *Central States Southeast and Southwest Areas Pension Fund v. Gerber Truck Serv., Inc.*, 870 F.2d 1148, 1151 (7th Cir. 1989). Section 515 operates to free pension and welfare funds from defenses that pertain to the unions' conduct. *Robbins v. Lynch*, 836 F.2d 330, 33 (7th Cir. 1988).

The Plan argues that the Seventh Circuit has repeatedly rejected fraud-in-the-inducement defenses against collection action, and therefore, allowing Gopher News to pursue those claims against the Union would add unnecessary issues to the case and unduly complicate it. But whether Gopher News would be entitled to raise a fraud-in-the-inducement defense against the Plan does not necessarily mean a complaint against the Union must necessarily be litigated separately.

Two courts in this district appear to have split over the issue of whether to allow an employer to implead a union to bring a fraud-in-the-inducement claim in an ERISA collection action. At least one court in this District has interpreted Section 515 to bar a defendant in an ERISA collection action from impleading the union to raise claims against the Union that it could not raise against the Plan. *See Laborer's Pension Fund v. McKinney Constr. Corp.*, No. 99 C 5435, 2000 WL 1727779, *3-4 (N.D. Ill. Nov. 21, 2000). The court ruled that allowing the company to add the union would unduly complicate the trial, adding issues apart from those raised in a simple audit and collection action and therefore inconsistent with the underlying purpose of Section 515. *Id.* Another court in this District

4

has reached an opposite conclusion. *Trustees of the Chicago Painters and Decorators Pension, Health and Welfare v. North Avenue Constr. Co.*, No. 01 C 4297, 2002 WL 63815, * 3 (N.D. Ill. Jan. 17, 2002). In that case, the court held that because the company could not use fraud in the inducement as a defense in the collection action, any liability the union might have to the company would "not impact on the ability of the Funds to collect whatever delinquency" was owed. *Id.*

Although the Seventh Circuit has not spoken directly on the issue, it hinted in *dicta* that a company could implead a union in a case in which the company alleged the union might be secondarily liable to it. *Robbins*, 836 F.2d at 334 (noting that the company did not implead the union). Given the Seventh Circuit's position in *Robbins*, the Court finds the reasoning in *North Avenue Constr.* more convincing. The Court therefore holds that allowing the Company to implead the Union is not necessarily inconsistent with the purposes of Section 515, and that Section 515 does not serve as an absolute bar against impleading a third-party defendant in an ERISA collection action.

The Plan, however, raises another objection to allowing the third-party complaint: its timeliness. This litigation commenced in December 2006. The parties pursued settlement for more than eight months but were unable to reach an agreement. Three months later, the Company filed this motion. Discovery is scheduled to close at the end of February 2008. Dispositive motions are due in March 2008.

The Company argues that it delayed filing the third-party Complaint to allow the Plan to complete its audit and to pursue settlement discussions. It argues that it would have been disruptive to begin motion practice during these discussions. The Company's argument is not convincing. If in the eyes of the Company it truly believes the Union should contribute to any liability it has to the

5

Plan, then pursuing settlement without the Union was foolish at best. Moreover, if awaiting the conclusion of settlement discussions were the sole reason for delay, the Company should not have let six weeks slip by after those discussions failed before seeking to implead the Union.

The Company also argues that little discovery has taken place. Although the Company and the Plan have exchanged little in the way of documents prior to the Company's decision to file this motion, undoubtedly, adding the Union would delay the resolution of this case. The Plan notes that the Union might file a motion to dismiss, which would begin another cycle of motion practice which would delay the resolution of this case.[1] More importantly, the scope of discovery would also be expanded because litigation between the Company and the Union would raise different questions than litigation between the Plan and the Company. In this case, the issue before the Court centers around whether the failure to forward the Warehouse unit CBA violated the adverse selection rule in the Plan's participation agreement. In litigation between the Company and the Union, the issue before the Court would center on whether the Union deceived the Company during the negotiation of the collective bargaining agreement. The former involves merely an inquiry into the plain language of the CBA and the participation agreement. The latter involves an inquiry into the behavior of the respective parties during the negotiation of those contracts.

Section 515 exists to streamline the litigation process of ERISA collection actions. The Court holds that allowing the Company to implead the Union after an 11-month delay, in order to bring a claim that relies upon facts outside the four corners of the agreement, would be inconsistent with the purposes of Section 515 and would unreasonably delay the litigation in this case. *See e.g.,*

---

[1] The Company suggests the Plan has no standing to assert claims the Union might bring. This, of course, is obvious, but not relevant. The fact that the Union might choose to bring such a motion creates the possibility of delay.

6

*Highlands Ins. Co.*, 10 F.3D 1251 (motion to implead brought after close of discover and three weeks before summary judgment materials due untimely); *Albino v. City of Chicago*, 578 F. Supp. 1487, 1489 (N.D. Ill. 1983) (motion filed 18 months afer action commenced untimely, particularly where it resulted in proliferation of issues). The Court therefore DENIES the Company's Motion for Leave to File a Third-Party Complaint.

### III. Motion to Intervene

The four drivers, who are the sole remaining members of the Drivers Unit of Local 638, seek to intervene under Fed. R. Civ. P. 24(b) in order to sue the Plan for breach of fiduciary duty, the Union for breach of the duty of fair representation, and the Company for breach of contract. According to the drivers, the Plan should not have terminated the plan, but instead sought unpaid contributions from the Company, and in failing to do so, breached its fiduciary duty to them. Similarly, they contend that the Company and Union should not have engaged in the creative job classification arrangement that led to this suit, arguing that if the Union fraudulently induced the Company the Union breached its duty to fairly represent them or conversely if the amendment of the Warehouse unit CBA violated the adverse selection rule then the Company it breached its agreement to make contributions for all of its drivers.

Permissive intervention under Rule 24(b) "is within the discretion of the district court where the applicant's claim and the main action share common issues of law or fact and where there is independent jurisdiction." *Ligas ex rel. Foster v. Maram*, 478 F.3d 771, 775 (7th Cir. 2007). As noted earlier with regard to the Company's proposed Third-Party Complaint, it is not apparent that the drivers' claims share common issues of law and fact with the original claim.

The individual drivers contend, in a sweeping generalization, that because their claims revolve around whether the CBAs submitted by the Union and Company violated the Plan's adverse selection rule that they share common facts with the Plan's claim. The Plan's Complaint poses a simple question of contract interpretation: do the CBAs violate the adverse selection rule? That question simply is not relevant to any of the individual drivers' claims. Instead, the drivers' claims revolve around inquiries into the behavior of the respective parties: did the Plan act rashly in terminating the Company?; did the Plan lie to the Company in contract negotiations?; or did the Company attempt to sneak one by the Plan in hiding the job classification in the Warehouse unit CBA?

Although one or more of these questions may become more important to the drivers depending on the Court's resolution of this case, none is related to the simple question of whether the failure to forward the Warehouse CBA violated the adverse selection rule. Indeed, the drivers themselves note as much. They have stated, quite clearly, that if the Court rules in favor of the Plan on that question, then their claim against the Company is strengthened. Or, if Company prevails in its claim against the Union, then their claim against the Union is "all but proved." In other words, allowing the drivers to intervene would not significantly contribute to the underlying factual development of this case, for they are interested in the outcome only insofar as it directs them to the appropriate party to remedy their injury.

Finally, as the Plan points out, the individual drivers' motion is untimely. Here, the individual drivers failed to file the motion to intervene nearly one year after the Plan initiated the suit. A prospective intervenor must move promptly to intervene as soon as it knows or has reason to know that its interests might be adversely affected by the outcome of the litigation. *See e.g., Southmark Corp. v. Cagan*, 950 F.2d 416 (7th Cir. 1991) (fifteen month delay inexcusable); *Sachs*

*v. Reef Aquaria Design, Inc*, No. 06 C 1119, 2007 WL 2973841 (N.D. Ill. Oct. 5, 2007) (year-delay inexcusable).

Although the individual drivers claim they did not learn of the lawsuit until November 2007, timeliness does not turn upon actual knowledge of the suit, but upon when a prospective intervenor knew or should have known about its interest in a case. *South v. Rowe*, 759 F.2d 610, 613, (7th Cir. 1985). In this case, the drivers learned in late 2006 that the Plan had terminated the Company's participation in the pension plan and they also knew that the Company had ceased making contributions to their pension. These facts should have alerted the drivers to the fact that there might be litigation between the Company and the Plan that would adversely affect their interests.

As noted above, adding claims to the suit — particularly claims that cannot (and some that might never) be litigated until the original claim is resolved — will delay the resolution of this suit. Such delay is inconsistent with Section 515. Moreover, the individual drivers' claims will not be prejudiced if they are not allowed to join this suit. They may file their claims elsewhere, and may even drastically reduce their litigation costs. If they wait until this case is resolved, their discovery plan will be that much more streamlined for they will know more clearly the appropriate defendant to remedy their alleged injury.

Accordingly, the Court DENIES the Motion to Intervene.

### IV. Motion to Amend

On November 28, 2007, the Company discovered documents that led it to believe that the Plan planned to audit the Company in July 2005, but at the request of the Union delayed the audit until after the Company and Union negotiated the 2005 CBA. These documents, the Company

9

argues, provide a basis for several counterclaims against the Plan, and on December 31, 2007, the Company sought leave to amend its answer to include these counterclaims.

The Plan argues initially that because the Court ordered that all amendments to pleadings be completed by December 17, 2007 that the Court should deny the Company's request as untimely. The Company did not, however, discover the factual basis for these claims until November 28, 2007, when it received documents from the Plan that suggested the Plan and the Union may have agreed to delay the audit until after the 2005 CBA negotiations completed. At that time, the Company already was engaged in briefing its motion to file a third-party Complaint. Moreover, Rule 11 requires a reasonable inquiry to determine that the claims are warranted under existing law. Without doubt, the Company should have alerted the Court to the newly discovered information and requested that the date to amend be extended. The Court, however, can see no prejudice arising from a two week delay in filing the amended answer. *See, e.g., Dubicz v. Commonwealth Edison Co.*, 377 F.3d 787, 793 (7th Cir. 2004) (delay alone generally insufficient to deny leave to amend).

The Plan also argues that the amended counterclaim should be denied as futile. The Plan argues, for instance, that Count I of the Counterclaim is futile because there is no tort of aiding and abetting fraud. In support the Plan sites to *Eastern Trading Co. v. Refco, Inc.*, 229 F.2d 617, 623 (7th Cir. 2000), and *Cenco, Inc. v. Seidman & Seidman*, 686 F.2d 449, 453 (7th Cir. 1982). Neither *Eastern Trading* nor *Cenco*, however, go so far as to suggest that one who aids and abets a fraud has no tort liability. *Eastern Trading Co.*, 229 F.3d at 623; *Cenco, Inc.*, 686 F.2d at 453. Instead, they hold only that a plaintiff cannot bring both a fraud claim and an "aiding and abetting" fraud claim against the same party. *Eastern Trading Co.*, 229 F.3d at 623; *Cenco, Inc.*, 686 F.2d at 453. That is because "aiding and abetting" a fraud is a theory for holding a person who aids and abets liable

for the fraud itself. *Hefferman v. Bass*, 467 F.3d 596, 601 (7th Cir. 2006). Though the Company should plead claims and not theories, *Vincent v. City Colleges of Chicago*, 485 F.3d 919, 923 (7th Cir. 2003), its decision to include a theory does not make its claim futile.

The Plan next contends that Count II of the Counterclaim is futile because there is no tort of civil conspiracy. Again, the Plan relies on *Cenco* to support its argument. *Cenco* does not go so far as the Plan would like. The court noted that if a conspiracy fails and there is no underlying injury, there is no tort for an inchoate offense. *Cenco*, 686 F.2d at 453. The court goes on to note that if a conspiracy succeeds the conspirator is liable for the underlying offense. *Id.* In other words, like the theory of "aiding and abetting," "conspiracy" is a theory to hold a defendant liable for an underlying tort. Courts have dismissed conspiracy claims when they duplicate other claims that plaintiffs have adequately pleaded. *Thomas & Betts Corp. v. Panduit Corp.*, 108 F. Supp. 2d 968, 975 (N.D. Ill. 2000); *Real Colors, Inc. v. Patel*, 974 F. Supp. 645, 651 (N.D. Ill. 1997). Here the conspiracy claim rests upon the same factual allegations as the fraud claim, and as such is unnecessary as a separate Count. Consequently, the Court will not allow Count II of the Counterclaim, but will allow the paragraphs within to be incorporated with Count I of the Counterclaim.

The Plan's next argument is fanciful and borders on frivolous. It argues that the claim for unjust enrichment is futile because it is a remedy and not a claim. Its argument is based on either a gross misreading or a blatant misrepresentation of *Fed. Deposit Ins. Corp. v. Bank One, Waukesha*, 881 F.2d 390, 392 (7th Cir. 1989). *Bank One, Wakesha* clearly recognizes unjust enrichment claims, and deals with whether the statute of limitations period should be found in tort or in contract. *Id.* (noting that "unjust enrichment *claims* are conceived as contracts implied in law") (emphasis added).

11

The Plan is cautioned that future arguments such as this will require it to show cause why it should not be sanctioned pursuant to Rule 11.

Count IV of the Counterclaim, the Plan argues, is futile because the claim for restitution belongs to the employees "who want to continue to participate in the Pension Fund." The Court, however, has no basis whatsoever to conclude what the employees would like to see done with any alleged mistakenly paid contributions. The Seventh Circuit has held that employers do have standing to recover mistakenly paid pension contributions if the equities favor it. *Construction Industry Retirement Fund of Rockford Ill. v. Kasper*, 10 F.3d 465, 467 (7th Cir. 1993).

Finally, the Plan argues that Count V of the Counterclaim (Declaratory Judgment) is futile because it is redundant and merely rehashes several affirmative defenses raised by the Company. Central States cites no convincing authority for its argument, however.

For the foregoing reasons, the Court therefore GRANTS the Motion to Amend consistent with this opinion.

IT IS SO ORDERED.

2/19/08

Dated

Hon. William J. Hibbler
United States District Court

12